IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LOIS RODDEN,

        Plaintiff,

  v.

JEFFERSON PILOT FINANCIAL
INSURANCE COMPANY, *et al.*,

        Defendants.
                                /

No. C 07-6489 SI

**ORDER RE: PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

On December 12, 2008, the Court heard argument on the parties' cross-motions for summary judgment. After consideration of the parties' papers and the record, the Court hereby GRANTS plaintiff's motion and DENIES defendant's motion except as noted in footnote 1.[1]

**BACKGROUND**

This case arises out of defendant Jefferson Pilot Financial Insurance Company's ("JPF") termination of plaintiff's long term disability benefits in May 30, 2006, when JPF determined that plaintiff no longer met the Sanyo Long Term Disability Plan's definition of "disabled" because she was able to perform the functions of her occupation, "Office Manager." Plaintiff Lois Rodden is a 65 year

---

[1] Citing *Everhart v. Allmerica Financial Life Insurance Company*, 275 F.3d 751 (9th Cir. 2001), defendants contend in their motion for summary judgment that Jefferson Pilot Financial Insurance Company is not a proper defendant because it is only a third party insurer and did not administer the Plan. Plaintiff's papers do not address this point. However, the complaint alleges that JPF is an ERISA fiduciary. Complaint ¶ 2. The Court is unable to resolve this question based upon the state of the parties' papers. The Court directs the parties to meet and confer on this issue, and if the parties disagree on whether JPF is a proper defendant, the parties shall file letter briefs of no more than 5 pages no later than **January 12, 2009**.

old woman who began working as an Office Manager at Sanyo Semiconductor Corporation in June 2000.

In February 2004, plaintiff developed right tendinitis and epicondylitis that caused numbness and pain in her right hand, fingers and arm. Flanagan Decl. Ex. B at 84, 226. Initially plaintiff sought treatment from a licensed acupuncturist, but that treatment did not resolve her symptoms. *Id*. at 239, 282. Plaintiff was also seen at the South Bay Pain and Rehabilitation Clinic for physical therapy. *Id*. at 224, 241, 246-54. In June 2004, plaintiff began treatment with Dr. Brian Karvelas, M.D., physical medicine and rehabilitation. *Id*. at 127-32. Dr. Karvelas' findings are discussed at length *infra*. At some point in the spring of 2004, plaintiff submitted a workers compensation claim; the "Employer's Report of Occupational Injury or Illness" states "Due to daily work duties employee has numbness and pain in right hand, fingers and arm." *Id*. at 226.

In June 2004, plaintiff's doctor put her on worker's compensation disability leave. *Id*. at 115. While plaintiff was on leave, an ergonomic evaluation was completed on August 8, 2004 by an ergonomics consultant from Ergonomic & ADA Division of RehabWest, Inc. *Id*. at 164-68. The report stated that plaintiff's job required 3 to 5 hours of intermittent use of the computer keyboard, with 50% of the time using a mouse/tracking device. *Id*. at 165. The report also found that plaintiff's job duties included 30 minutes of "stapling/removal," 30 minutes of hole punching, less than 30 minutes of photocopying, and less than an hour of telephone use per day. *Id*. The report also recommended several ergonomic products, such as an electric stapler and an ergonomic keyboard, designed to reduce grasping, finger motion and muscle strain. *Id*. at 168. Once the ergonomic adjustments were in place, plaintiff was released to return to work. *Id*. at 178.

Plaintiff returned to work on September 7, 2004. *Id*. at 103. Plaintiff's symptoms continued to flare with work activities and she was again put on total disability. *Id*. at 179. Plaintiff also reported that the use of ergonomic keyboard exacerbated her problems. *Id*. at 262. Plaintiff stopped work again on September 24, 2004. *Id*. at 103.

**I.    The Plan**

By virtue of her employment, plaintiff was eligible for long term disability coverage under the

2

Sanyo Long Term Disability Plan ("the Plan").[2] The Sanyo Group Long Term Disability Plan provides disability benefits at 67% of the insured's pre-disability monthly earnings. Flanagan Decl. Ex. A at 11. An insured must satisfy a 90 day elimination period before benefits are payable. *Id*. The Plan defines disability as follows:

> Totally Disabled and Total Disability mean that during the elimination period and the next 24 months because of an Injury or Sickness You meet *all* of the following:
>
> a) You are unable to do the Material and Substantial Duties of Your Own Occupation; *and*
>
> b) You are receiving Appropriate Evaluation and Treatment from a Physician for that Injury or Sickness; and
>
> c) Your Work Earnings are less than 20% of Your Indexed Pre-Disability Monthly Earnings.
>
> The definition changes 24 months after the end of the Elimination Period. From that point on, Totally Disabled and Total Disability mean because of an Injury or Sickness, *all* of the following are true:
>
> a) You are unable to do the Material and Substantial Duties of any occupation for which You are or may become reasonably qualified by education, training, or experience; *and*
>
> b) You are receiving Appropriate Evaluation and Treatment from a Physician for that Injury or Sickness; and
>
> c) Your Work Earnings are less than 20% of Your Indexed Pre-Disability Monthly Earnings.

*Id*. at 22-23 (emphasis in original). The Plan defines "Own Occupation" as follows: "Own Occupation means the duties that You regularly performed for which You were covered under this Policy immediately prior to the date Your Disability began. The occupation may involve similar duties that could be performed with Your Employer or any other employer." *Id*. at 19. The Plan also states that "From time to time You must give proof satisfactory to Canada Life at Your expense that You are still Disabled. Canada Life will ask You for this proof at reasonable intervals. Canada Life will stop Monthly Income Benefits if You do not give proof satisfactory to Canada Life that You are still Disabled." *Id*. at 58.

## II.    Plaintiff applies for benefits

---

[2] The policy was issued by Canada Life Assurance Company and subsequently assumed by JPF.

In November 2004, plaintiff submitted a claim for long term disability benefits to JPF. *Id*. at 120-21. Plaintiff indicated that she had been disabled as of June 24, 2004, and that she was unable to work due to pain in her right hand and arm and numbness in her fingers. *Id*. at 120. Tina Chronis, the Vice-President of Administration at Sanyo, completed the "Long Term Disability Claim Job Analysis." *Id*. at 117-18. Ms. Chronis stated that computer work, filing and "general paperwork" were the "major tasks" of plaintiff's job requiring the use of both hands, and that writing was a major task requiring the use of one hand. *Id*. at 118. In response to a question asking "Can the job be modified to accommodate the disability either temporarily or permanently?" Ms. Chronis answered "Yes" and "We provided accommodations recommended by ergonomic evaluation, but problem persists." *Id*. In response to a question asking "Is it possible to offer the employee assistance in doing the job (through use of technology or personal assistance for example)?" Ms. Chronis answered "No" and "We think difficult due to confidential nature of this position." *Id*.

Dr. Karvelas completed the attending physician's statement. *Id*. at 123-25. Dr. Karvelas diagnosed plaintiff as having right wrist tendinitis and epicondylitis, and stated that he was treating plaintiff with Relafen (an anti-inflammatory drug) and physical therapy. *Id*. Dr. Karvelas stated plaintiff could not perform "repetitive manipulations & forceful activities with [right] hand." *Id*. Dr. Karvelas described plaintiff's prognosis as "good, but will need period of rest & rehabilitation," and that he expected "gradual improvement with rest and rehabilitation therapies." *Id*.

After initial review of the claim forms, JPF called plaintiff on December 14, 2004 to discuss the claim and inform her that the initial forms did not "reflect a severe condition" but that upon receipt of plaintiff's medical records JPF would have the file reviewed by a medical professional. *Id*. at 101. In January 2005 JPF received treatment records from Dr. Karvelas and a physical therapist. These records included a June 17, 2004 Initial Specialist's Consultation report by Dr. Karvelas. *Id*. at 127-32. That report states that plaintiff's current symptoms included "throbbing aching pain at the base of the right thumb extending over the dorsolateral aspect of the forearm, wrist and hand, and numbness in the small, ring and little fingers of the right hand. She also experiences weakness of the right thumb. Symptoms are worse with repetitive manipulation, particularly mouse use." *Id*. at 128. Dr. Karvelas' June 17, 2004 examination revealed:

4

> . . . positive Tinel's sign over the ulnar nerve at the cubital tunnel on the right reproducing numbness in the medial three digits of the right hand. Tinel's sign is also positive over the radial nerve at the distal right forearm producing a tingling sensation to the right thumb. Phalen's maneuver is positive bilaterally producing tingling and numbness into the fingers of both hands. . . .

*Id.* at 130.[3] Dr. Karvelas also found tenderness in plaintiff's right thumb, dullness over the tips of the small and ring fingers of the right hand and to a lesser extent over the tip of the middle finger, and reduced grip strength on the right. *Id.* at 130-31. In the June 17, 2004 report, Dr. Karvelas diagnosed plaintiff with right wrist tendinitis, ulnar neuritis, possible first metacarpophalangeal degenerative joint disease, and possible carpal tunnel syndrome. *Id.* at 131.

The other treatment records that JPF received in January 2005 included a June 21, 2004 x-ray of plaintiff's right hand that showed mild metacarpal-trapezial arthrosis, *id.* at 138; June 30, 2004 electromyography and nerve conduction studies which were normal, *id.* at 149-52; the August 2004 ergonomic evaluation, *id.* at 163-68; and a January 25, 2005 treatment report by Dr. Karvelas. *Id.* at 281-89. In the January 25, 2005 report, Dr. Karvelas opined that plaintiff had a disability involving her right upper extremity with a "loss of approximately 50% of pre-injury capacity for lifting, pushing, pulling, grasping, pinching, holding, torquing and performing other activities of comparable physical effort." *Id.* at 288. Dr. Karvelas stated his opinion that plaintiff was credible and that she had "participated conscientiously with the rehabilitation program and overall her efforts to return to work have been genuine." *Id.* Dr. Karvelas concluded that plaintiff "is currently unable to perform her regular work duties." *Id.* at 289.

On February 2, 2005, Sanyo completed another job analysis for JPF. *Id.* at 276-77. Consistent with the prior job analysis, Yoshi Paulovich, Senior Manager, General Operator, wrote that computer work, filing, and general paperwork were "major tasks" requiring the use of both hands, and that writing was a major task requiring the use of one hand. *Id.* at 277. Ms. Paulovich stated that Sanyo "provided accommodations suggested by ergonomic study, but problem persists," and that it was not possible to

---

[3] "Tinel's Sign is 'a tingling sensation ['pins and needles'] in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration [sic] of the nerve.' Dorland's Illustrated Medical Dictionary 1703 (30th ed. 2003). Phalen's Maneuver involves reducing the size of the carpal tunnel by holding the hand straight, with the wrist fully flexed or extended, for 30 to 60 seconds. *Id.* at 1094 and 1414." *Creech v. UNUM Life Ins. Co. of North America*, 2006 WL 41186, at *4 n.8 (6th Cir. Jan. 9, 2006).

5

offer plaintiff any additional assistance to perform her job. *Id.*

On February 7, 2005, JPF conducted a medical review of plaintiff's claim. *Id.* at 278-79. The reviewer wrote that "initial rest relieves tendinitis and a gradual return to increased activity follows easily. . . . Frankly, it takes little strength to perform the duties of an office manager, specifically related to the effort and degree needed to type and use a mouse." *Id.* at 278. The reviewer also stated that because plaintiff was left hand dominant she could use her left hand to use the mouse and it would give her right hand a rest from repetitious movements, and that it was "questionable" why the medical providers did not come to that same conclusion. *Id.* at 278-79.

JPF then sent plaintiff's file to Dr. Kamran Hakimian for an independent medical records evaluation. *Id.* at 290, 295-96. Dr. Hakimian's initial review, dated April 6, 2005, found that plaintiff's "restrictions and disability are appropriate." *Id.* at 300. Dr. Hakimian also stated that "one modality that might help to alleviate her symptoms further is intraarticular injection that could be performed by a hand specialist." *Id.* In an addendum, Dr. Hakimian clarified:

> After reviewing the ergonomic report, although Ms. Roden [sic] is left handed, she uses her right hand for a variety of tasks such as keyboarding, using the mouse, using the calculator, photocopying, punch holing, filing and using the phone. All of these can aggravate degenerative changes at the metacarpal-trapezial arthrosis. Therefore, she would not be able to perform her usual and customary occupation and disability [that] was given by Dr. Karvelas seems to be appropriate.

*Id.* at 311. Based on this review, by letter dated August 17, 2005, JPF informed plaintiff that her claim was approved, and that after consideration of the 90 day elimination period, benefits for her claim would begin retroactive to December 24, 2004. *Id.* at 318.

### III.   JPF terminates plaintiff's benefits

In March 2006, JPF wrote to Dr. Karvelas requesting treatment notes and updated information regarding plaintiff's medical condition. *Id.* at 354-56. Dr. Karvelas provided a work capacity form stating that, as of May 2006, plaintiff was capable of working full time at a sedentary occupation with the specific work restrictions of "repetitious forceful activities or manipulations with the right hand. Very forceful gripping with the left hand." *Id.* at 363.

JPF then arranged for an Occupational Analysis performed by Vocational Rehabilitation

6

Coordinator LaDella Holmes-Reddick. *Id.* at 368-69. Ms. Holmes-Reddick's Occupational Analysis states that she reviewed a job analysis provided by Sanyo; a telephone interview with plaintiff's employer about her job duties; the Department of Transportation Dictionary of Occupational Titles description of "Office Manager"; and the "O-Net." *Id.* Ms. Holmes-Reddick concluded that it was her "professional opinion and with a degree of vocational certainty that it would be possible for Ms. Rodden to perform her occupation." *Id.* In reaching this conclusion, Ms. Holmes-Reddick evaluated whether plaintiff could perform the occupation of Office Manager as it existed in the national economy, not whether plaintiff could perform the occupation of Office Manager as she actually performed that job at Sanyo. Ms. Holmes-Reddick testified at her deposition:

> Q. Am I correct, in preparing your occupational analysis, you were seeking to determine if she could perform the occupation of office manager as it was performed in the national economy?
>
> A. Correct.

Elizabeth Green Decl. Ex. B at 43:21-25 (Holmes-Reddick deposition). Ms. Holmes-Reddick distinguished between plaintiff's "job," which included the duties she performed before she became disabled, and plaintiff's "occupation," which is how the position of "Office Manager" is performed in the national economy. *Id.* at 20-23, 42:21-25 ("[W]e were looking at the occupation and not the job. So while it may be a requirement for her job, it's not necessarily a requirement for her occupation in the general economy based on the information provided in the DOT."). In performing her evaluation, Ms. Holmes-Reddick did not consider whether plaintiff could perform the particular duties of her job at Sanyo:

> Q. Am I correct, in doing the occupational analysis, you were trying to determine if Miss Rodden could do the job duties that she was performing before she was disabled?
>
> A. No, if I'm understanding your question correctly.

*Id.* at 21:11-15. Ms. Holmes-Reddick also did not consider the 2004 ergonomic evaluation in determining whether plaintiff could perform her "occupation":

> Q. And am I correct in that you did have the information that the employer had provided, accommodations recommended by Ergonomic Evaluation, but the problem still persisted according to the employer?
>
> A. Correct.

7

| | | |
|---|---|---|
| 1 | Q. | And was that information taken into account in preparing your occupational analysis? |
| 2 | | |
| 3 | A. | Viewed as not relevant. |
| 4 | Q. | Why not? |
| 5 | A. | Because we were looking at the occupation and not the job. So while it may be a requirement for her job, it's not necessarily a requirement for her occupation in the general economy based on the information provided in the DOT. |
| 6 | | |
| 7 | Q. | To your knowledge, is there anything in the insurance policy or the plan given to Miss Rodden that references the national economy or the DOT? |
| 8 | A. | Not to my knowledge. |

*Id*. at 42:11-43:5.

In a letter dated May 30, 2006, JPF informed plaintiff that "[i]t is our determination that, based upon the medical evidence available, you no longer satisfy the definition of disability." Flanagan Decl. Ex. B at 371. The letter quoted Dr. Karvelas' May 4, 2006 statement that plaintiff was capable of performing a full-time sedentary occupation provided that the occupation did not entail *"repetitive forceful activities or manipulations with* [your] *right hand"* or *"very forceful gripping with* [your] *left hand."* *Id*. (emphasis in letter). The letter continued,

> Based upon the above restrictions/limitations, a vocational review was conducted which concluded that you would not be precluded from performing the *Material and Substantial Duties* of your occupation as an Office Manager.
>
> In summary, based upon the available treatment information, it is determined that your residual functional abilities, including the noted work restrictions and/or limitations, would not prevent you from performing your own occupation. Accordingly, you are no longer disabled as defined within your policy and no further benefits are payable on your claim at this time.

*Id*. (emphasis in letter).

### IV. Plaintiff's first appeal

Plaintiff appealed the termination of her benefits. *Id*. at 377. Plaintiff's appeal letter stated, *inter alia*, that she had visited Dr. Karvelas on July 11, 2006 for her periodic exam, and that "[h]e has declared once again that my disability has not changed. It is permanent and I am unable to perform the usual and customary work as Office Manager." *Id*. Plaintiff included with her appeal letter a note dated July 11, 2006 from Dr. Karvelas stating that plaintiff was "[p]recluded from returning to usual and

customary work as office manager at Sanyo due to permanent disability restricting her from repetitive manipulation or forceful activities w/r [right] hand, or forceful gripping w/ [left] hand." *Id*. at 387.

By letter dated August 15, 2006, JPF acknowledged receipt of plaintiff's appeal letter. *Id*. at 384. The letter stated that "it may be beneficial to our review to have the office notes from [the July 11, 2006] visit" with Dr. Karvelas, as well as "any and all additional medical evidence that you believe would support your appeal." *Id*. In response, plaintiff submitted a July 21, 2005 progress report completed by Dr. Karvelas, *id*. at 386, and a chart note from Dr. Karvelas dated July 11, 2006. *Id*. at 389-90.

JPF forwarded the file to an orthopedic surgeon, Dr. R. David Bauer, who prepared a records review. Dr. Bauer's report is dated September 25, 2006. *Id*. at 395-98. Dr. Bauer stated that "After reviewing the medical information, the only objective facts noted are that the claimant has normal electrodiagnostics, no positive physical findings other than symptomatic complaints, and an x-ray that shows mild arthritis at the wrist joint." *Id*. at 397. Dr. Bauer opined that plaintiff "would be precluded from constant keyboarding" but that "the material functions of the job appear to include other functions, including phone work and other paperwork . . . ." *Id*. Dr. Bauer also stated that the "restrictions and limitations placed upon the claimant's work activities by her attending physician are not reasonable or consistent with the medical findings" and that "[h]er symptomatic complaints are not supported by the objective findings." *Id*.

In a letter dated November 16, 2006, JPF informed plaintiff that it was upholding its decision to terminate plaintiff's benefits based upon Dr. Bauer's review. *Id*. at 406. The letter stated, *inter alia*, that "the medical documentation does not support a condition that would render you unable to perform the main duties of your occupation and does not support a total disability beyond 6/24/06." *Id*. at 407.

### V.     Plaintiff's second appeal

On May 11, 2007, plaintiff, through her counsel, pursued her second and final level of appeal with the JPF Appeals Council. *Id*. at 409. In support of her appeal, plaintiff submitted letters from Dr. Karvelas and her supervisor at Sanyo. Dr. Karvelas provided a three page response to Dr. Bauer's review:

9

> In discussing Ms. Rodden's right upper extremity disability Dr. Bauer limits his discussion to the degenerative arthritis at the base of her right thumb and all but ignores the repetitive strain injury which is the predominant feature of her work disability. Ms. Rodden's repetitive strain injury to her right upper extremity is clearly outlined in the medical reports I previously authored and which were reviewed by Dr. Bauer in preparing his Peer Review Report.
>
> Perhaps Dr. Bauer's rationale for ignoring the primary cause of her work disability (the industrial repetitive strain injury) derived from his stated opinion that, "The only objective facts noted are that the claimant has normal electrodiagnostics, no positive physical findings other than symptomatic complaints, and an x-ray that shows mild arthritis at the wrist joint."
>
> Once again, Dr. Bauer chooses to ignore documented objective findings including a positive Tinel's sign over the ulnar nerve at the right medial elbow, sensory changes in an ulnar distribution in the right hand, and specific areas of tenderness including at the right lateral epicondyle.
>
> . . .
>
> I would like to further point out that in cases of repetitive strain injury it is common for there to be a paucity of what you might call "hard" objective findings (for example, anatomical changes, radiographic or electrodiagnostic evidence) due to the nature of the injury primarily involving tendinitis or other microtrauma to connective tissues. In my experience, treating countless patients with repetitive strain injuries, Ms. Rodden's presentation is consistent with that of a typical repetitive strain injury patient.
>
> . . .
>
> . . . According to Ms. Rodden and supported by an Ergonomic Evaluation Report of Rehab West, Inc. dated August 6, 2004, computer keyboarding was performed for three to five hours of an eight-hour workday in addition to mousing, photocopying, faxing, stapling, filing and hole punching.
>
> Clearly, the physical demands of her work would constitute a requirement for frequent to constant repetitive manipulations and forceful activities. As I previously stated, given the level of her disability, she would be unable to meet these work demands and is therefore precluded from performing her usual and customary work duties as an office manager for Sanyo Semiconductor.
>
> I would additionally like to offer that in the evaluation process for a disease entity such as repetitive strain injury where there are less obvious objective findings, clinical judgment plays an extremely important role. This, of course, necessitates physical examination of the patient. I am certain that much of the difference in opinion between myself and Dr. Bauer reflect the fact that Dr. Bauer apparently did not have an opportunity to perform a physical examination on Ms. Rodden.

*Id*. at 414-15.

Tina Chronis, who had been plaintiff's immediate supervisor, also submitted a letter in support of plaintiff's second level appeal. Ms. Chronis stated that plaintiff "was always an excellent dedicated employee," and stated her belief that plaintiff "was completely credible." *Id*. at 417. Ms. Chronis

described plaintiff's unsuccessful efforts to work with the accommodations provided by Sanyo, and also noted that plaintiff's job requirements "included a lot of work on the computer as well as a great amount of time on the phone." *Id.* at 416.

JPF forwarded the letters from Dr. Karvelas and plaintiff's supervisor to Dr. Bauer for the second level appeal review. *Id.* at 438. Dr. Bauer wrote that Dr. Karvelas' letter "does not alter the opinion of my prior review." *Id.* at 450. JPF also had plaintiff's file reviewed by Dr. Joseph Thomas. Dr. Thomas stated,

> . . . Insured does have findings that would influence her ability to use the mouse and keyboard in a standard manner, but some accommodations would likely relieve some of the stress. It is noted that the thumb is not used in keyboarding other than to impact the space bar and would not be expected to be limiting keyboarding. Ergonomic keyboards are available, as is voice activated software that lessens the amount of keyboarding necessary. Insured apparently went out of work on a WC claim and did not return. Peer review was performed by orthopaedic surgeon Bauer, while treating MD was PM&R Karvelas. It is noted that Karvelas supplied a RTW note that gave sedentary capacity with limited forceful gripping of the left hand and with more severe restrictions of the right, non dominant hand in May of 2006. While these restrictions are somewhat severe, they are not entirely out of line. In my opinion, these would allow insured to rtw as an office manager at that time, and reasonable accommodations are in the marketplace that would address the need to keyboard and use mouse, i.e., voice activated software and touch pads instead of a mouse.
>
> . . .
>
> Additional Comments/Recommendations: Bauer review appropriate and reasonable, fully qualified to opine on findings, PM&R opinions are not completely appropriate. Overuse syndromes resolve with rest and can be addressed with accommodations in the workplace. Job as described in national economy should be within insured's capacity from May 2006 onward.

*Id.* at 443.

By letter dated October 8, 2007, JPF informed plaintiff that it was denying her second level appeal. JPF stated that "the medical documentation does not support a condition that would prevent Ms. Rodden from performing the material and substantial duties of her occupation as an Office Manager beyond 6/24/06. . . . Ms. Rodden's mild wrist arthritis in her non-dominant hand would not functionally limit or significantly impair her ability to perform the main duties of her sedentary occupation. Again, these main duties do not include lifting greater than 10 lbs, forceful gripping, repetitive use of a computer mouse, use of hand tools, etc. Additionally, appropriate treatment for Ms. Rodden's condition (such as anti-inflammatory medications and/or a wrist brace) would further allow Ms. Rodden to

11

successfully perform her occupation." *Id*. at 469. This lawsuit followed.

## LEGAL STANDARD

Summary adjudication is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 317 (1986). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *See T.W. Electric*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986)); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

The parties have stipulated that the Court reviews *de novo* defendant's decision to terminate plaintiff's LTD benefits. On *de novo* review, the Court may consider evidence outside the administrative record, such as the deposition testimony of Ms. Holmes-Reddick. *See Jebian v. Hewlett-Packard Co. Employee Benefits Organization*, 349 F.3d 1098, 1110 (9th Cir. 2003). The parties' cross-motions for summary judgment focus on two main issues. First, whether plaintiff was disabled from

12

performing the substantial and material duties of her "Own Occupation." Second, whether plaintiff was receiving "appropriate care" as required by the Plan.

### I. "Own Occupation"

Defendant contends that it properly terminated plaintiff's LTD benefits because the restrictions and limitations described by plaintiff's attending physician Dr. Karvelas in May 2006 would not prevent plaintiff from performing the duties of her occupation as it exists in the national economy. According to JPF, the material and substantial duties of Office Manager include coordination of clerical personnel, evaluation of office production and procedures, reviewing and maintaining records, and preparing reports using the computer, but do not require constant keyboarding. *Id*. at 368-69. As of May 2006, Dr. Karvelas stated that plaintiff was capable of full time sedentary work, with the specific restrictions of "repetitious forceful activities or manipulations with the right hand [,] [v]ery forceful gripping with the left hand." *Id*. at 363. JPF concluded, based on the occupational analysis performed by Ms. Holmes-Reddick, that Dr. Karvelas' work restrictions would not prevent plaintiff from performing her occupation as Office Manager.

Plaintiff contends that JPF's occupational analysis is deficient because JPF did not consider plaintiff's actual job duties at Sanyo as required by the Plan. Plaintiff argues that her job at Sanyo required substantial amounts of computer usage, that she became disabled due to a repetitive strain injury caused by that computer usage, and that the record shows that plaintiff could not perform the duties of that job.

The Court agrees with plaintiff, and finds that if JPF had applied the correct definition of "Own Occupation" as set forth in the Plan, plaintiff would be found disabled. The Plan defines "disabled" as the inability to perform "the Material and Substantial Duties of Your Own Occupation," and "Own Occupation means the duties that You regularly performed for which You were covered under this Policy immediately prior to the date Your Disability began. The occupation may involve similar duties that could be performed with Your Employer or any other employer." Flanagan Decl. Ex. A at 19. Defendants emphasize the second sentence of the "Own Occupation" definition, and argue that JPF correctly evaluated the duties of plaintiff's "occupation" by determining how the "Office Manager"

13

position is performed with other employers nationally. However, defendants completely ignore the first sentence in the "Own Occupation" definition. The Plan states that "Own Occupation *means* the duties that *You regularly performed* for which you were covered under this Policy *immediately prior to the date* Your Disability began." *Id*. (emphasis added). In evaluating plaintiff's "Occupation," JPF was required to consider the duties that plaintiff "regularly performed . . . immediately prior to the date" of her disability. JPF could supplement the occupational analysis – "The occupation *may* involve" – by considering "similar duties that could be performed with [plaintiff's] Employer or any other employer." *Id*. However, under the plain language of the Plan, JPF could not simply ignore plaintiff's actual job duties at Sanyo and define her "Occupation" solely by reference to how the position of "Office Manager" might be performed in the national economy. *See Lasser v. Reliance Standard Ins. Co.*, 344 F.3d 381, 385-86 (3d Cir. 2003) (holding "'regular occupation' is the usual work that the insured is actually performing immediately before the onset of disability," and it was arbitrary and capricious for plan administrator to define "regular occupation" by reference to how that job is "performed in a typical work setting for any employer in the general economy.").[4]

It is undisputed that Ms. Holmes-Reddick assessed the "Office Manager" occupation based on how that job is performed in the national economy. It is also clear that JPF terminated plaintiff's benefits based upon that occupational assessment; Dr. Bauer and Dr. Thomas both concluded that plaintiff was not disabled from performing the duties of "Office Manager" as that occupation was defined by Ms. Holmes-Reddick. Flanagan Decl. Ex. B at 397, 469. Based on the evidence in the record, plaintiff's actual job duties included substantial computer usage, as well as other duties such as photocopying, faxing, stapling, filing and hole punching. After plaintiff lost her administrative assistant in 2003, her job began to include significantly increased time on the computer. The August 2004 ergonomic evaluation of plaintiff's job states that she used the computer for 3 to 5 hours per day on an

---

[4] Defendant's reliance on *Kinstler v. First Reliance Standard Ins. Co.*, 181 F.3d 243 (2d Cir. 1999), is misplaced. In *Kinstler*, the long term benefits policy did not define "regular occupation." The court held that "regular occupation" is defined "more narrowly than any means for making a living, but it is not limited to the insured's particular job." Here, in contrast, the policy specifically (and more narrowly) defines "Own Occupation" as "the duties You regularly performed . . . immediately prior to the date Your Disability began." As stated *supra*, the occupational definition can be augmented by how the occupation is performed for other employers, but under the terms of the Plan, "Own Occupation" is primarily defined by how that occupation is regularly performed by the employee.

14

intermittent basis, *id.* at 165, and both job evaluations provided by Sanyo state that computer work, filing and "general paperwork" were the "major tasks" of plaintiff's job requiring the use of both hands. *Id.* at 118, 277.

The record demonstrates that when plaintiff's condition is evaluated in connection with her actual job duties at Sanyo, plaintiff was unable to perform the substantial and material duties of the Office Manager position, and thus entitled to benefits under the Plan. At the time JPF terminated plaintiff's benefits, and throughout the appeals process, the medical evidence showed that as a result of plaintiff's repetitive stress injury she had a "permanent disability restricting her from repetitive manipulations or forceful activities with [her] right hand." *Id.* at 387 (Dr. Karvelas' July 11, 2006 note). JPF approved plaintiff's claim after both Dr. Karvelas and JPF's reviewer, Dr. Hakimian, concluded that plaintiff was unable to perform the duties of the Office Manager position. The Court notes that while Dr. Karvelas treated plaintiff for several years, neither Dr. Bauer nor Dr. Thomas ever met with plaintiff, despite the fact that JPF could have required plaintiff to be medically examined. Flanagan Decl. Ex. A at 49. The Court also finds it very significant that an extensive ergonomic evaluation was performed on plaintiff's job, and that plaintiff attempted to work with ergonomic adjustments and modifications, such as an ergonomic keyboard, and that her symptoms worsened.[5] There is no suggestion that plaintiff was malingering, and in fact her employer submitted a letter strongly vouching for plaintiff's credibility and attesting to plaintiff's dedication and excellence as an employee. Thus, the evidence in the record shows that plaintiff was not able to perform the duties of her "Own Occupation."

**II.     "Appropriate Care"**

---

[5] The Court notes that in the appeal process, Dr. Thomas stated that plaintiff could perform the duties of the "Office Manager" position by using an ergonomic keyboard and voice activated software. *Id.* at 450. However, the record shows that plaintiff had attempted to use an ergonomic keyboard to no avail, and her employer stated that it was not possible to provide additional assistance through technology or an assistant due to the confidential nature of the job. *Id.* 101, 118, 120. Dr. Bauer similarly opined that plaintiff "should use her shoulder more than her hand, as recommended by the ergonomics specialist" and "should position herself in the appropriate position." *Id.* at 397. Dr. Bauer never examined plaintiff, and it is unclear what the basis is for his assumption that plaintiff had not attempted using her shoulder and positioning herself as recommended by the ergonomics specialist because both plaintiff and her employer reported that the "ergonomic recommendations implemented, problem persists." *Id.* 118, 120.

15

Defendant contends that it is entitled to summary judgment on the ground that plaintiff did not receive "appropriate care" for her condition as required by the Plan. However, plaintiff correctly argues that defendant's emphasis on "appropriate care" is overstated because the only criticism of plaintiff's care at the time of denial (as documented in the second appeal denial letter) was that "appropriate treatment for Ms. Rodden's condition (such as anti-inflammatory medications and/or a wrist brace) would further allow Ms. Rodden to successfully perform her occupation." Flanagan Decl. Ex. B at 469. Neither the initial termination of benefits letter nor the first level appeal denial cited plaintiff's alleged failure to receive "appropriate care" as a basis for the termination of plaintiff's benefits. Indeed, even the second appeal denial letter, quoted above, does not clearly state that plaintiff's benefits were being terminated due to failure to receive "appropriate care." Defendant is required to provide to plaintiff all bases for its denial and may not suggest alternate reasons for denial (such as defendant's litigation assertion that plaintiff should have gone to the doctor more often) after the fact. *See* 29 C.F.R. § 2650.503-1(g)(1)(I); *Jebian*, 349 F.3d at 1104.[6]

### III.   Reinstatement of benefits/remand

Plaintiff contends that the Court should award plaintiff benefits from the date of termination through the date of judgment. Defendant argues that if the Court is inclined to award any retroactive benefits, those benefits should be awarded only until the date on which the Plan's definition of "disability" would have changed, and when plaintiff would have been required to make a greater showing of disability.

Plaintiff cites *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001), for the proposition that remand is inappropriate when the Court engages in *de novo* review. In *Grosz-Salomon*, the plaintiff received long-term disability benefits for four years until the plan terminated her benefits based upon two in-house medical "consultations" performed by doctors who did not examine the plaintiff. The district court granted summary judgment in favor of the plaintiff, and

---

[6] In any event, the record does not support defendants' contention that plaintiff was not receiving "appropriate care." Plaintiff's medical records show that plaintiff had been prescribed anti-inflammatory medications and an elbow splint, obtained physical therapy, acupuncture, and electrical stimulation, and other forms of treatment.

16

reinstated the plaintiff's benefits effective the date of termination.

The Ninth Circuit found that the district court did not abuse its discretion in fashioning the remedy. *Id*. at 1163. "Paul Revere did not misconstrue the definition of 'disabled,' or apply the wrong standard to evaluate Grosz-Salomon's claim. It applied the right standard, but came to the wrong conclusion." *Id*. *Grosz-Salomon* did not address the situation presented here where the definition of disability changed after 24 months. In *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998), which was cited favorably by the *Grosz-Salomon* court, a plaintiff was approved to receive benefits for eight months under a long-term disability plan, and advised that at the end of the eight month period, her benefits would be terminated but that she could submit additional medical documentation in support of her claim. *Quinn*, 161 F.3d at 474. At the end of the eight month period, the plan found that the plaintiff was not disabled. The district court granted summary judgment in favor of Quinn, and ordered reinstatement of her benefits. The Seventh Circuit affirmed on the merits, but reversed the district court's reinstatement order. The court noted that Quinn was not scheduled to continue receiving benefits after the eight month period, but rather that Quinn's eligibility for benefits was to be reevaluated at the end of that period. "[The plan's] decision to deny Quinn's claim was arbitrary and capricious, but not necessarily wrong. . . . This is not a case where it is clear-cut that it was unreasonable for Calhoon to deny Quinn's benefits." *Id*. at 478.

Here, but for defendant's wrongful decision to terminate plaintiff, she would have received benefits for 24 months during the "'Own Occupation" period. Flanagan Decl. Ex. B. at 321. At that time, plaintiff would have been reevaluated under a more stringent definition of disability requiring plaintiff to show that she was disabled from any occupation. *Id*. On the record before the Court, it is not "clear-cut" that plaintiff would be considered disabled under the post-24 month definition of disability.[7] None of the cases cited by plaintiff, in which courts have awarded full reinstatement of benefits through the date of judgment, address a situation like the instant case. Accordingly, the Court

---

[7] The Court is sympathetic to plaintiff's argument that, setting aside the factual question of whether plaintiff would meet the Plan's definition of disability from any occupation, it would be extremely difficult for an individual with plaintiff's health condition, age, and educational background to find a job.

17

finds that it is appropriate to award plaintiff benefits through the "Own Occupation" period and to remand to the Plan for a determination of plaintiff's eligibility for benefits after that date consistent with this Court's summary judgment order.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS plaintiff's motion for summary judgment and DENIES defendant's motion for summary judgment. (Docket Nos. 24 & 36). The Court reinstates plaintiff's benefits from the date of termination through the end of the 24-month "Own Occupation" period. The Court remands this case to the Plan for a determination of plaintiff's eligibility for long term benefits after the expiration of the "Own Occupation" period. The Court VACATES the January 12, 2009 trial date. Plaintiff may file a motion for attorneys fees within 30 days of the filing date of this order. As set forth in footnote 1, if the parties are unable to resolve the issue of whether JPF is a proper defendant, the parties shall file letter briefs on the issue no later than January 9, 2009.

**IT IS SO ORDERED.**

Dated: December 30, 2008

SUSAN ILLSTON
United States District Judge